UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH CHARLES OJEDA,<br><br>  Petitioner,<br><br>  v.<br><br>W. L. MUNIZ, Warden,<br><br>  Respondent. | Case No.  15-00117 EJD (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK** |

Petitioner has filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state conviction. Respondent filed an answer on the merits. Petitioner did not file a traverse although given an opportunity to do so. For the reasons set forth below, the Petition for a Writ of Habeas Corpus is **DENIED**.

**I. BACKGROUND**

On October 19, 2011, a jury in Santa Clara County Superior Court convicted Petitioner of first degree murder, and found true the allegations that he personally and intentionally discharged a firearm causing death, and that he had sustained a prior strike offense. (Ans. Ex. 1, Clerk's Transcript ("CT") at 329-332.[1]) On December 16, 2011, Petitioner was sentenced to 75 years to life in state prison. (2 CT 377.)

---

[1] All references herein to exhibits are to the exhibits submitted by Respondent in support of the answer.

On September 4, 2013, the California Court of Appeal affirmed the judgment. (Ex. 5.) On the same day, the appellate court summarily denied a petition for writ of habeas corpus. (Ex. 6.)

Petitioner sought review of both proceedings in the California Supreme Court. On November 26, 2013, the state high court denied review of both the direct appeal, (Ex. 8), and the habeas matter, (Ex. 10).

Petitioner filed the instant habeas petition on January 9, 2015.

## II. STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal.[2]:

> Hayward Brandon supported himself by selling small amounts of marijuana, often from a car in front of a fast-food restaurant. On June 10, 2007, he was selling from a rented Mitsubishi Galant. On that day defendant asked his close friend, Daniel Lopez, to arrange a marijuana purchase for him. Lopez was then dating defendant's cousin, Sonia Macias. Lopez let defendant use his cell phone to call Brandon to arrange the transaction, and an uncle or cousin of either Sonia or defendant gave Lopez and defendant a ride to a McDonald's restaurant near Alviso and Santa Clara.
>
> After waiting for Brandon for five minutes, Lopez went into the McDonald's to use the restroom. When he emerged, he crossed paths with Brandon, who appeared to be in pain. When Brandon collapsed in front of him, Lopez quickly left the restaurant. The car he had arrived in was gone, as was Brandon's car. Lopez called Macias, who arranged for another of her cousins, Corrina Amarillas, to pick him up at a Carl's Jr. nearby. Amarillas drove Lopez to a bush where he had hidden some methamphetamine paraphernalia, and the two then went to Alviso to pick up Macias. Lopez saw that she was "hysterical, crying, [in] shock." Defendant, on the other hand, was "[k]ind of quiet, mellow."
>
> Lopez went on to recount what defendant told him had happened while Lopez was inside the McDonald's restroom. Defendant told Lopez that he had gotten into the back seat of Brandon's car, while Macias got into the front passenger seat. The transaction went "bad," however. Defendant believed that Brandon had given him counterfeit money in change. Defendant shot Brandon and then took his money back, along with the marijuana, Brandon's cell phone, and several boxes of shoes. Brandon got out of the car; defendant jumped into the driver's seat and drove away. Defendant later offered shoes to Macias and to Lopez.

---

[2]This summary is presumed correct. <u>Hernandez v. Small</u>, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

Lopez had seen defendant with a nine-millimeter gun a couple of months before, and he was carrying it earlier that day as well. Lopez had not seen him bring the gun with him to the McDonald's, however. Defendant told Lopez that he had gotten rid of the gun. Lopez saw defendant smash Brandon's cell phone. Amarillas eventually drove Lopez and Macias to Macias's house in San Jose.

Lopez later learned from the newspaper that Brandon had died. He called defendant to tell him about it, but otherwise the two did not speak about the incident again.

Defendant's truck was pulled over by San Jose police on June 11, four days after the homicide. Lopez was a passenger, but he ran away because he had drug paraphernalia on him. Defendant was arrested when a small amount of marijuana was found on him. In July, however, police arrested Lopez and interviewed him about the Brandon case. Lopez denied being in the photographs taken from the McDonald's security video; he and defendant were fellow gang members, which meant being loyal and "never snitching" to authority figures. However, a few months later, Lopez broke up with Macias and began a romantic relationship with defendant's cousin, Sylvia Lujan. Theirs was an unhappy relationship which deteriorated into thefts of each other's property. Lujan described Lopez as a "very heartless, lying, conniving thief" who was "absolutely" not honest. When they broke up, the friendship between Lopez and defendant fell apart.

In April 2010 Lopez learned that while in custody defendant had written notes requesting that Lopez be attacked and violently removed from the gang. Lopez contacted the Santa Clara police and offered to exchange information about the Brandon homicide for placement in the witness protection program. Lopez described the events of June 7, 2011, and testified for the prosecution at trial.

Richard Armendariz also appeared at trial. He had known defendant for 15 years and was uncomfortable testifying against him. Once or twice while they were both in county jail, defendant told Armendariz about the homicide. He said that he and "some dude" were going to rob someone for his drugs, using a handgun. "Sonia" and a male cousin were with him. Defendant named the McDonald's in Santa Clara as the location of the "jacking" and identified Brandon as the victim. The two argued over the drugs and defendant shot Brandon in the upper abdominal area. Then he took the victim's car and they all got away. Defendant said he dropped the gun, which was a .22 or 9-millimeter handgun, in a creek behind some movie theaters in Santa Clara.

Rick Souza, a detective from the City of Santa Clara police department, investigated the homicide. At trial he described the trail of blood from the parking lot into the McDonald's and the security video showing Lopez's "suspicious" behavior, Brandon's path from the car into the restaurant, and the car being driven away. Inside the car was a 9-millimeter shell casing. A 9-millimeter bullet was removed from Brandon's left shoulder at the autopsy. No bloodstains or latent prints were found in the inside of the car. The outside surface did yield areas of latent prints.

In late July of 2007 the police questioned Macias, Lopez, Amarillas, defendant, and Amarillas's husband, John Macias. Defendant denied that he had ever met Brandon. In November 2007 Souza submitted the fingerprints to AFIS, the Automated Fingerprint Identification System. He learned that there was no "match" to the suspects, which led Souza to believe that defendant's prints were not on Brandon's car. By the time Souza retired from the police department in March 2010, no one had been charged with Brandon's murder; it had "gone stale." It was not until May of 2010, after Lopez came forward, that police arrested defendant for the crime.

After a preliminary examination, defendant was accused by information with murder, in violation of Penal Code section 187. [FN1] Attached to the charge were allegations that he had personally used a firearm (§ 12022.53, subds. (b), (c), and (d)) and that he had suffered a prior strike (assault with a deadly weapon), within the meaning of the Three Strikes Law (§ 667.5, subd. (c); § 1192.7, subd. (c)).

> FN1. All further statutory references are to the Penal Code.

The parties delivered their opening statements to the jury on September 26, 2011. The prosecutor told the jury that no DNA or fingerprint evidence connected the suspects to the case. Defense counsel also said there was no evidence that defendant was ever in the car: "You won't hear about any fingerprints. You won't hear about any DNA." The prosecution, counsel added, had only the word of Lopez and Armendariz, who were both "drug users, thieves, liars."

On October 3, 2011, defendant moved for a mistrial. Counsel said he had received a "bombshell" in the form of the new evidence the prosecution had revealed only the previous week, during its case in chief. Counsel felt "'blindsided.' Why? Because our whole defense in this case was that the two prosecution witnesses, two snitches, if you will, both the in-custody informant and the out-of-custody informant, Lopez and Armendariz, were the sole case for the prosecution against Mr. Ojeda." Counsel pointed out that defendant's prints were already known, as he had been arrested for marijuana possession the day after the homicide. There was no accusation of bad faith, no attempt to hide evidence; it was, counsel believed, "just overlooked…. [B]ut the effect is still the same."

Defense counsel explained why the oversight had already prejudiced the defense: "And so when I come into court and we're voir diring the jury, the whole purpose of my voir dire, as the Court is aware, was witness credibility. I told the… [C]ourt [*sic*] that they're going to hear from witnesses that could be liars, drug addicts, thieves, people who have lied to the police before. My whole focus and the focus of the defense was to cast doubt upon the credibility of the prosecution witnesses that were going to stand and accuse Mr. Ojeda. [¶] I never talked about physical evidence. As far as I knew, there wasn't any." In other words, he not only had told the jurors that they would not hear any fingerprint or DNA evidence, but had focused his cross-examination of witnesses on their credibility rather than on defendant's prior contacts with the victim. And during voir dire,

had he known there was fingerprint evidence he would have inquired of bias, by asking prospective jurors whether they would expect scientific or fingerprint evidence and how they would feel about the defendant's guilt if there were such evidence. Now, however, his credibility was "seriously impaired."

The court proposed a remedy in the form of an instruction with CALCRIM No. 306. The court suggested that because the prosecution had also anticipated no fingerprint evidence, her credibility was no better than defense counsel's, so defendant was at no disadvantage. Counsel requested "at the very least" a "preinstructions" or admonition when the fingerprint testimony was to be introduced. The court agreed.

The court next took up an alternative motion of the defense, to exclude the fingerprint evidence under section 1054.5. Defense counsel rejected the remedy of a continuance "because of the way the discovery came out in the middle of trial."

The prosecutor explained how the fingerprint match had been discovered. In June of 2007 the police had latent prints, which were submitted to the central identification facility ("Central ID") in San Jose to determine whether the victim's prints were detected. Of the 40 latent prints, three were of the victim. In November, Sergeant Souza asked Central ID to "run the prints" through AFIS against those of defendant and the other suspects. Sergeant Souza believed that if AFIS reported no matches, "that was an exclusion. That was a mistaken belief."

The prosecutor had learned the previous week that it was a "very common misconception" that if a person's known prints are in AFIS, a latent print "will come up with a hit." Thus, when Sergeant Souza misinterpreted the November 2007 results, he erroneously reported the results as an exclusion of all the defendants. The prosecutor had likewise understood this lack of identification to be an exclusion. Apparently, she noted, so had defense counsel and others who had received the same information.

It was not until the evening of the first day of trial (September 26, 2011), while preparing for the fingerprint expert's testimony, that the prosecutor realized that the defendants' names were not identified as excluded in the reports in front of her. Believing that she was missing the exclusion report, the next day she asked Central ID to provide it. There were no such reports. The prosecutor asked for confirmation that Central ID had actually excluded the defendants, but the employee on duty informed her that no comparison had been requested, and therefore no exclusions existed.

The prosecutor immediately had the police department submit the prints of defendant, Macias, and Lopez to Central ID. The following day, the third day of trial, she informed defense counsel what had been happening. Midday on the fourth day of trial (September 29), the prosecutor learned that one fingerprint matched defendant, and she immediately informed defense counsel of this fact. Counsel for both parties received copies of all the prints and reports, as did the defense expert.

The prosecutor acknowledged that "this is something… [she] should have caught earlier," but, she noted, she disclosed the new information within hours of receiving it. She agreed with the court that there was no issue of credibility because she too had told the jury that there was no fingerprint evidence. In the prosecutor's view, "We don't stop investigations in cases just because a jury is sworn. If something comes up or if something is missed…, it's not uncommon for investigation to proceed during a trial and for evidence to come forth in the middle of trial." The prosecutor disagreed with the court's suggestion that "discovery doesn't mean just known evidence but should have known."

Before the introduction of the fingerprint evidence on October 5, 2011, the court read to the jury the following stipulation by the parties: "The defense and the prosecution stipulate that at opening statement on September 26, 2011, both parties told the jury that there would be no fingerprint evidence presented at this trial because that is what they believed to be true. [¶] On the evening of Tuesday, September 27th, 2011, the prosecution discovered that a comparison of the latent prints from the victim's car and the known prints of Ralph Ojeda had not actually been performed. The prosecution notified the defense of this fact on the morning of Wednesday, September 28th, 2011. [¶] In the days following this discourse, fingerprint experts of both sides have engaged in this omitted analysis. The results of this examination which has just now come to light will now be put into evidence."

The court then instructed the jurors with language from CALCRIM No. 2.28, which advised them that the prosecution's untimely disclosure had been unjustified, but that the new evidence would nevertheless be admitted, and that the weight and significance of the evidence was for them to determine. [FN2]

> FN2. The instruction as given stated: "The prosecution and the defense are required to disclose to each other before the trial the evidence each intends to present at trial so as to promote the ascertainment of the truth, save the Court time, and avoid any surprise which may arise during the course of the trial. Delay in disclosure of any evidence may deny a party sufficient opportunity to subpoena necessary witnesses or to produce evidence which may exist to rebut the [non-complying] party's evidence. [¶] Disclosure of evidence are [*sic*] required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately. [¶] In this case, the People failed to timely analyze the following evidence: latent fingerprint evidence from the victim's car. Although the People's failure to timely disclose evidence was without lawful justification, the Court has, under the law, permitted the production of this evidence during trial. [¶] The weight and significance of any delayed analysis are matters for your consideration. However, you should consider whether… the untimely disclosure of the latent print analysis pertains to a fact of importance, something trivial, or subject matter already established by other credible evidence."

> John Bourke and Sergeant Souza were then recalled to testify about latent print number 18, a partial print lifted from the surface of the car in front of the rear passenger's door. Bourke explained that it could not be determined when the print was left there. Souza testified that in November 2007 he submitted the latent prints to the central identification facility for reexamination. He inferred from the results that no match to defendant had been found. It was only the prior week, during trial, that he learned that defendant's prints had not actually been excluded.
>
> Just before both parties rested, Lopez was recalled to the stand. He acknowledged having introduced defendant to Brandon before the day of the crime. On that occasion Brandon was driving an older Jeep, not the Galant. Defendant was there with Brandon and Lopez, and possibly with Macias, on another occasion, but Lopez did not recall what kind of car Brandon was driving at that time.
>
> The court read a modified version of CALJIC No. 2.28 during its final instructions before the jury began its deliberations. The prosecutor called attention to the fingerprint during opening and closing arguments to the jury. Defense counsel primarily focused his argument on the lack of credibility and bad character of both Lopez and Armendariz. He acknowledged the fingerprint evidence but directed the jurors' attention to the absence of prints on any surface *inside* the car. Counsel also observed that there were two reasonable inferences from the circumstantial evidence of the fingerprint, one of which was "that he put his fingerprint on the rear passenger door at some other time when he was at Mr. Brandon's car." He emphasized to the jurors that because this reasonable inference pointed to innocence, it must be accepted.

People v. Ojeda, No. H037819, slip op. at 1-9 (Cal. Ct. App. Sept. 4, 2013) (hereinafter "Op.").

### III.  DISCUSSION

A.  Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Here, as noted, the California Supreme Court summarily denied Petitioner's petitions for review. (See Exs. 8 & 10.) The California Court of Appeal, in its opinion on direct review, addressed the claims Petitioner raises in the instant petition. (See Ex. 5.) The Court of Appeal thus was the highest court to have reviewed those claims in a reasoned decision, and, as to those claims, it is the Court of Appeal's decision that this Court reviews herein. See Ylst v.

Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions. See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington v. Richter, 131 S. Ct. 770, 783-85 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" Id. at 1307 (citation omitted). With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

B.    Claims and Analysis

Petitioner asserts the following grounds for relief: (1) the admission of the untimely evidence deprived Petitioner of due process and effective assistance of counsel, (Pet. at 7); and (2) the trial court erred in not excluding the fingerprint evidence or declaring a mistrial, (id. at 8-9). In his answer, Respondent points out that these two claims were the two "subheadings" presented in state court under the umbrella claim that Petitioner was denied a fair trial, and are essentially the same. (Ans. at 11, fn. 4; Ex. 7 at 3, 15.) As such, Respondent addressed the claims together. As the California Court of Appeal stated, "The sole issue on appeal is whether the court's admission of the fingerprint evidence was an abuse of discretion and deprived defendant of due process and effective assistance of counsel." (Op. at 9.) Petitioner has filed no traverse contesting this characterization of his claims. Accordingly, the Court will review Petitioner's claims in the manner they were addressed by the state appellate court.

1.    Due Process

The Court of Appeal rejected Petitioner's first contention and found no abuse of discretion in admitting the untimely evidence that resulted in a due process violation:

> Both parties point to section 1054 et seq., which sets forth the exclusive rules of discovery in criminal cases and prescribed the possible remedies for discovery

violations. Section 1054.1, subdivision (f), requires the prosecutor to disclose to the defense reports of experts, "including any reports or statements of experts made in conjunction with the case, including the results of… scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence." Such disclosure must be made at least 30 days before trial, but "[i]f the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately, unless good cause is shown." (§ 1054.7.)

Section 1054.5, subdivision (b), permits a trial court to "make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure."

Here the prosecutor disclosed the new fingerprint evidence as soon as she received it. Based on this fact, the People assert that no violation of section 1054.7 occurred. As defendant points out, however, the trial court found otherwise, by ruling that the People should have properly analyzed the evidence earlier, and it instructed the jury accordingly. We need not decide whether we agree with the trial judge that a discovery violation actually occurred, because the only questions presented to us is whether the instruction with CALJIC No. 2.28 was an adequate remedy.

Defendant acknowledges that the trial court had broad discretion in selecting a remedy for the prosecution's discovery delay. (*People v. Jenkins* (2000) 22 Cal.4th 900, 951 [courts have broad discretion in determining proper sanction for discovery abuse]; see also *People v. Ayala* (2000) 23 Cal.4th 225, 299 [rulings on discovery matters reviewed under an abuse of discretion standard].) He contends, however, that instead of giving an instruction, which could not have cured the harm, the court instead should have either granted a mistrial or excluded the evidence.

Under section 1054.5, subdivision (c), the court was not authorized to prohibit the evidence regarding the new fingerprint analysis unless "all other sanctions [had] been exhausted." "Even where the prosecution acts willfully and in bad faith – which is contrary to the trial court's finding in this case – 'the extreme sanction of dismissal is rarely appropriate unless a defendant has established prejudice by the failure of the People to comply with the discovery order [citation] and the prejudice cannot be otherwise cured [citation]; lesser sanctions must be utilized by the trial court, unless the effect of the prosecution's conduct is such that it deprives defendant of the right to a fair trial.'" (*People v. Wimberly* (1992) 5 Cal.App.4th 773, 792-793 (fn. omitted), quoting *Mendibles v. Superior Court* (1984) 162 Cal.App.3d 1191, 1198.) This provision reflects a legislative concern for "'potential prejudice to the truth-determining function of the trial process.'" (*People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1757, quoting *Taylor v. Illinois* (1988) 484 U.S. 400, 415.)

Defendant's argument as to the mistrial ruling is that the court did not understand that it had this option, believing instead that mistrial is not a proper remedy for untimely discovery unless exclusion would be sufficient.  Our reading of the trial transcript, however, reveals no misunderstanding of the law.  The court only decided that in the circumstances presented, a mistrial would be improper because other viable remedies were available.  That conclusion was entirely consistent with section 1054.5.

We see no abuse of discretion or due process violation in selecting admonitions to the jury as a remedy for the prosecution's missteps.  As in *People v. Jenkins*, *supra*, 22 Cal.4th at page 952, here defendant has failed to establish that a prosecutor's delay in obtaining and disclosing inculpatory evidence "requires a particular sanction as a matter of due process."  Nor can the admission of the fingerprint evidence, tempered by the jury admonitions, be said to have offended due process by rendering the trial fundamentally unfair.  (See *People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20.)  The trial court followed the statutory procedures for remedying discovery violations and selected one that accommodated both fairness to the defendant and the "truth-determining function of the trial process."  (*People v. Gonzales*, *supra*, 22 Cal.App.4th at pp. 1757-1758.)  The court ameliorated any potential unfavorable impression of the defense and thus accommodated defense counsel's concern by repeatedly advising the jury that it was the prosecution's failure to obtain a timely analysis of the fingerprints that led to the new evidence contradicting both parties' initial positions at trial.  Defense counsel could have asked for a continuance, but he affirmatively rejected that opportunity – on the theory that his credibility with the jurors had been irreversibly compromised because he had already told them in his opening statement that there would be no fingerprint evidence.  [FN3]  He did not suggest to the trial court that a continuance would have been useless in challenging the accuracy and reliability of the new evidence or otherwise explaining it.

> FN3. As noted, the trial court pointed out that the prosecutor had also stated that there would be no fingerprint evidence.

Defendant now contends that "[s]ince the premise of the entire defense case proved to be false, there was no longer a defense case."  While arguing that a timely disclosure would have *eliminated* his defense of innocence based on the lack of physic evidence, he nonetheless does not suggest what alternative defense could or would have been substituted to achieve a more favorable outcome.  (Cf. *People v. Verdugo* (2010) 50 Cal.4th 263, 282 [without elaboration, "generalized statements" that timely disclosure "would have enabled [defense] counsel to adjust his theory of the case" are insufficient to demonstrate prejudice].)

Clearly defendant was surprised by the new disclosure.  But absent ambush by the prosecution (which clearly was not present here), "surprises may still sometimes happen at trial."  (*People v. Bell*  (1998) 61 Cal.App.4th 282, 291.)  The prosecutor complied with her statutory duty by informing defense counsel of her efforts to obtain a re-examination of the fingerprints and then immediately informing him of the result.  Defendant elected not to secure a continuance in

> order to examine the new evidence and refute its reliability through additional experts and cross-examination of prosecution witnesses relating to the test procedure and results. Instead, he chose to focus primarily on the same strategy he adverted to in his opening statement, by attacking the credibility of Lopez and Armendariz. He nonetheless did emphasize to the jury that the fingerprint could have been left in the car on a prior occasion, and there was no way to know how long it had been there. Defendant fails to convince us that the trial was infected by such "substantial and irremediable" prejudice that the only appropriate remedy was to exclude the evidence or declare a mistrial. (*People v. Gonzales*, *supra*, 22 Cal.App.4th at p. 1757.)

Op. at 9-13.

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir.), cert. denied, 479 U.S. 839 (1986). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Colley, 784 F.2d at 990.

After reviewing the state appellate court's opinion and the underlying record, the Court finds the admission of the evidence was neither arbitrary nor so prejudicial that it rendered the trial fundamentally unfair. Id. The state appellate court reviewed the relevant discovery statutes in determining whether the trial court's chosen remedy for what it found to be an untimely disclosure was adequate. *See supra* at 9-10. Prohibiting the admission of the evidence was certainly one of the remedies the trial court could impose under section 1054.5, subdivision (b), but subdivision (c) also provided that it could not do so unless "all other sanctions [had] been exhausted." Id. at 10. It is also important to note that there was no accusation by the defense or finding by the trial court that the prosecution acted in bad faith. Accordingly, it cannot be said that the "extreme sanction of dismissal" was necessary or appropriate in these circumstances. Id. Furthermore, section 1054.5, subdivision (c) provides that such a remedy would only be appropriate if Petitioner established prejudice and that prejudice could not otherwise be cured. Id. The trial court provided the following remedies to cure any potential prejudice from the untimely disclosure: (1) before presentation of the fingerprint evidence, the trial court read to the jury a stipulation by the parties

1 explaining the circumstances under which the new physical evidence was discovered and why
2 neither party had not mentioned such evidence during opening statements; and (2) along with the
3 stipulation, the trial court instructed the jury with CALJIC No. 2.28, which advised them that
4 although the prosecution's untimely disclosure had been unjustified, the new evidence was being
5 admitted under the law, and it was for the jury to decide the weight and significance of the
6 evidence, including the fact of its delayed analysis. See supra at 5-6. The state appellate court
7 reasonably found the trial court's chosen remedies, which were in accordance with the relevant
8 statute, was not an abuse of discretion or violation of due process because it afforded "fairness to
9 the defendant": the trial court "ameliorated any potential unfavorable impression of the defense"
10 by "repeatedly advising the jury that it was the prosecution's failure to obtain a timely analysis of
11 the fingerprints that led to the new evidence contradicting both parties' initial positions at trial."
12 Id. at 11. The instructions also permitted the jury to take into consideration the fact that the
13 evidence was delayed in deciding its weight and significance. Id. at 6. The Court presumes that
14 the jury evaluated the fingerprint evidence with these instructions in mind. See Zafiro v. United
15 States, 506 U.S. 534, 540 (1993) ("'juries are presumed to follow their instructions'") (citing
16 Richardson v. March, 481 U.S. 200, 211 (1987)); Hovey v. Ayers, 458 F.3d 892, 913 (9th Cir.
17 2006) ("We presume that juries follow their instructions."). Furthermore, although the trial court
18 was willing to consider whether a continuance would be appropriate, defense counsel rejected
19 such a remedy outright, believing that his credibility with the jurors was "irreversibly
20 compromised" because he had already asserted in his opening statement that there would be no
21 fingerprint evidence. See supra at 5. But as the trial court pointed out, defense counsel was at no
22 more of a disadvantage than the prosecutor who had also stated that there would be no fingerprint
23 evidence in opening statements. Id. Because the remedial instructions were in accordance with
24 the discovery statutes and clearly advised the jury that the prosecution was at fault for the
25 untimeliness of the new evidence which accounted for defense counsel's contradictory statements
26 in opening argument, it cannot be said that the admission of the fingerprint evidence was arbitrary
27 or so prejudicial that it rendered the trial fundamentally unfair. See Walters, 45 F.3d at 1357.
28     The Court of Appeal also rejected Petitioner's contention that the admission of the

evidence rendered counsel ineffective:

> Nor did the disclosure delay result in ineffective assistance of counsel. Defendant did not complain to the trial court that the new evidence had irreparably damaged his ability to present a defense; he only claimed that it damaged counsel's credibility by contradicting his position in opening statements. This argument was vitiated by the admonitions given to the jury. There is no indication on the record before us that the defense strategy counsel chose was impaired beyond what he could have achieved through the additional preparation a continuance would have afforded him. He was nonetheless able to examine the evidence, cross-examine prosecution witnesses who had been involved in the processing of the fingerprints, and argue to the jury that the evidence was unreliable. The chief problem for the defense was not that the prosecutor's conduct or the court's remedy was prejudicial, but that the new evidence was inculpatory. But that fact alone could not have justified its exclusion or compelled a declaration of mistrial. "The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance." (*Taylor v. Illinois*, *supra*, 484 U.S. at pp. 414-415.)

Op. at 13.

The state court's determination that counsel was not rendered ineffective by the admission of the fingerprint evidence was reasonable in light of the evidence presented. As discussed above, any damage to counsel's credibility was ameliorated by the remedial instructions to the jury. See supra at 13. Furthermore, it does not appear that counsel's ability to present a defense was impaired for lack of a continuance because he was still able to: (1) examine the evidence, (2) cross-examine the witnesses involved in the processing of the fingerprints, and (3) argue to the jury in closing statements that the evidence was unreliable. See supra at 6-7. The fact that the new evidence was inculpatory and bolstered the prosecution's case did not automatically render counsel ineffective for arguing what had become a weakened defense, especially where Petitioner offers no alternative defense strategy which might have yielded a more favorable result. Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. See Strickland v. Washington, 466 U.S. 668, 689 (1984). Applying that presumption here, it cannot be said that counsel rendered ineffective assistance by proceeding with the defense of innocence and attacking the new evidence as unreliable. Accordingly, the state court

1  reasonably determined that the admission of the new evidence did not render counsel ineffective,
2  such that there was no resulting denial of the fundamentally fair trial guaranteed by due process.
3  See Kernan, 197 F.3d at 1031.

4      Based on the foregoing, the state courts' rejection of Petitioner's claims was not an
5  unreasonable application of Supreme Court precedent or based on an unreasonable determination
6  of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  Accordingly, Petitioner is not
7  entitled to habeas relief.

### IV.  CONCLUSION

10      After a careful review of the record and pertinent law, the Court concludes that the Petition
11  for a Writ of Habeas Corpus must be **DENIED**.

12      Further, a Certificate of Appealability is **DENIED**.  See Rule 11(a) of the Rules Governing
13  Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a
14  constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable
15  jurists would find the district court's assessment of the constitutional claims debatable or wrong."
16  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate
17  of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22
18  of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the Rules Governing Section 2254
19  Cases.

20      The Clerk shall terminate any pending motions, enter judgment in favor of Respondent,
21  and close the file.

22      **IT IS SO ORDERED**.
23  Dated:  5/9/2016

EDWARD J. DAVILA
United States District Judge

27  P:\PRO-SE\EJD\HC.15\00117Ojeda_denyHC